[No. 39397.   Department One.   September 7, 1967.]

THE STATE OF WASHINGTON, *Respondent*, v. RONALD EUGENE
JACKSON, *Appellant*.*

*J. P. Tonkoff* (of *Tonkoff, Holst & Hanson*), for appellant.

*Arthur R. Eggers*, for respondent.

HALE, J.—When Ronald Jackson took Enolabel Allen, a 13-year-old pregnant girl, on a long camping trip from Walla Walla County to the wilds of New Mexico, were the court and jury in error in finding him guilty of second-degree kidnapping?

Charges of kidnapping in the second degree were filed against the defendant under RCW 9.52.010, which, in pertinent part, reads:

Every person who shall wilfully,

. . . .

(2) Lead, take, entice away or detain a child under the age of sixteen years with intent to conceal him from his parent, parents, guardian or other lawful person having care, custody or control over him, . . . or shall abduct, entice, or by force or fraud unlawfully take or

*Reported in 431 P.2d 615.

carry away another to or from a place without the state, . . . shall be guilty of kidnaping in the second degree and shall be punished as in the case of a felony.

From a judgment and sentence entered upon a verdict of guilty, defendant brings this appeal, basing his major contentions on the premise that (1) the state failed, as a matter of law, to prove that the defendant did either lead, entice, take, or detain Enolabel, (2) with intent to conceal her from her parents, and (3) that her natural parents did not at the time have custody, care or control over Enolabel. Defendant contends, in brief, that the evidence was insufficient to submit the case to the jury and insufficient to support a verdict of guilty. Because the main claims of error concern the sufficiency of the evidence, we deem it advisable to narrate a substantial part of it.

Defendant, Ronald Eugene Jackson, and his wife, Dawn, living in Waitsburg with their three children, both taught school in the Waitsburg school system in Walla Walla County. The Allens, with eight children, lived in Waitsburg, too. Their daughter, Enolabel, met defendant and his family in 1963 through church activities. From then on, she visited the Jackson home frequently where the Jacksons helped her with her school work.

About 18 months before the events of this case took place, Enolabel began residing a great deal of the time— from 50 to 80 per cent—with the Jacksons. They bought her clothing, gave her some spending money, helped her with school work and treated her as one of their family. She, in turn, did a modest amount of household work and some baby-sitting for them. Her parents approved of the arrangement; they felt it was good for their daughter to be in the home of two school teachers where she would enjoy a better physical environment than they could provide her, and also where she would derive cultural advantages from being with educated adults. They agreed that the Jacksons could list Enolabel as a dependent on their federal income tax return. During the times that Enolabel stayed with the Jacksons, however, she saw her own parents frequently

and lived with them part of the time—20 to 50 per cent—and could not be said to be estranged from them.

In January, or early February, 1966, Enolabel informed the defendant that she was pregnant. She says that, when she told him about this, he said he was going to report it to the authorities, but that she did not want the word of her predicament to spread so she asked him not to. She said that, instead, Jackson asked her father to come to the Jackson house where they had a conference. According to Enolabel's testimony, her father, her 20-year-old brother, Levi, and her older sister, Nancy, were present, along with Mr. Jackson. Her father could remember no such conference. In Enolabel's version of the February conference, she did not identify the father of the child, merely implied the act occurred on a double date. She says that her father, brother and sister then agreed Jackson would take her away to have the baby. It later developed that her mother did not know of Enolabel's pregnancy and did not find out about it until Enolabel had returned in the custody of law enforcement authorities.

Then occurred the events upon which the prosecuting attorney based this information charging the defendant with kidnapping in the second degree. On the early evening of March 25, 1966, Enolabel attended a school program with Mrs. Jackson, defendant's wife. They returned to the Jackson residence and about 9:30 p.m. Enolabel asked Mrs. Jackson to take her home, telling her that she would return to the Jackson home the next day. She did not go to the Jackson home; instead, that very night, she met Jackson at the gun club and they departed. Concerning her rendezvous with the defendant at the gun club, she testified:

A. We were going to this school rhythm program that night, and I went with Mrs. Jackson, and after the rhythm program was over I went back to Jacksons home, and we visited with Mrs. Douglas until about 9:30. And then I had Mrs. Jackson take me home. I told her that I wouldn't be able to stay that night with her, that I would come over the next day. And I went home, and I got in a fight with one of my brothers, and I asked my mom if I

could go over to Jacksons, and she said okay. MR. TONKOFF: Go where? THE WITNESS: To Jacksons. And so I packed up some clothes, and instead of going to Jacksons I went over to Mr. Jackson. Q. Now, you say instead of going over to Jacksons you went over to Mr. Jackson. Where was Mr. Jackson? A. At the gun range. Q. And where is that located? A. It's about a mile from Jacksons home towards Dayton. Q. Near the city limits of Waitsburg? A. Yes. Q. Is this in Walla Walla County? A. Yes. Q. Now, was Mr. Jackson living there at the gun club? A. No. Q. Where was he there at the gun club? A. He had his pickup parked, and he was just waiting for me there. Q. You say he was waiting for you? A. Yes. Q. Will you just state what you mean by that? A. Well, he knew I was going to meet him, so he just waited. Q. How did he know you were going to meet him? A. Because we had planned this out before. Q. And just tell the jury when you planned this out? A. Well, we had talked about it quite a bit from the last of February until he had left. Q. And when did he leave? A. Two weeks before I did. Q. Did you know he was going to leave? A. Yes. Q. Did he ever tell his wife that he was going to leave? A. No. But I think he had talked it over with her before. MR. EGGERS: I wish to strike that. I just asked her did he ever tell her. Q. Prior to leaving home, you state the only thing you told your parents was that you were going to Jacksons, is that correct, that evening on March the 25th? A. Yes. Q. Now, on these plans that you had, will you just tell the jury what the plans were that you had? A. Well, that I was supposed to wait until the quarter ended and meet him that night at the gun club. Q. And when did the quarter end? A. Friday the 25th.

Testifying for the state on direct examination as to their plans after she met him at the gun club the night of March 25th, Enolabel said:

A. He was just going to take me some place so I wouldn't be around home so people wouldn't know that I was pregnant. And we were going to find some place to stay and write Dawn [Mrs. Jackson] after we were settled and have her come down in June with the rest of the kids.

At the time, the Jacksons had three children and Mrs. Jackson was expecting their fourth.

Enolabel related from the witness stand that she and Jackson drove all night in his truck, described as a power wagon. The next night, Saturday, they stayed at a motel in Burley, Idaho; they then drove to Green River, Wyoming, and bought some horses. After picking up the horses, they stayed in an abandoned house, a building without lights or running water, outside the town. From there, they drove through Colorado towards Denver and thence to New Mexico. During these travels, they slept in the truck.

Arriving at Las Vegas, New Mexico, on a Sunday, they spent two nights in a "sort of" motel and thence to a village called Rociada, about 20 miles north of Las Vegas, New Mexico. They remained at Rociada for 2 weeks, living in a rented adobe house. Defendant, she said, provided the money for food, transportation and lodging, and she did the cooking.

After 2 weeks in Rociada, she said that she and Jackson decided to go camping in the nearby high hills. They drove up into the wild country, pitched an eight-by-ten tent and had been camping up in the hills for 5 days when two peace officers from Las Vegas brought them in.

Enolabel testified that, from the time they left the gun club March 25, 1966, until the sheriff brought them down from the hills in New Mexico, she had not notified her mother or father of her whereabouts; that she had talked this over with Jackson and decided not to tell them until they settled down, as she described it, permanently, probably somewhere in Arizona. When they settled down in Arizona, she said they planned to write to her parents, both of them agreeing to this. At no time during their journeys did she consult with a doctor.

Thomas Allen, Enolabel's father, 70 years old at the time of trial, when called by the state, testified on direct that he and his wife had accompanied their daughter to the school program the night of March 25th; that on their return home, Enolabel told them she had quarreled with one of her brothers and she wanted to be away from home a few days. He said:

A. Well, we thought she went to Mrs. Jackson's because she had been over there quite a bit of the time baby-sitting for them. And Mr. Jackson and his wife had been treating us fine and treating her fine. And as far as I know, they was really trying to help the child up until that time.

When the Allens called Mrs. Jackson the next morning and found out that Enolabel had not been there, they reported their daughter missing to the sheriff's office. Mr. Allen testified, "And I told him that we didn't know what become of her, and I wanted her found. I didn't know where she was at or who she was with or anything about her." He said also he had no objection to her staying with the Jacksons, as he put it, $\frac{1}{3}$ to $\frac{1}{2}$ of the time, for they treated her well and paid her for baby-sitting. He did not testify that he ever relinquished his parental rights or control over Enolabel, but he assumed that Jackson would assert some discipline over Enolabel when she was at their house. As he expressed it, if she was to baby-sit, he wanted Jackson to "look after her just like she was his own while she was over there with them." He said he kept trying thereafter "to keep in touch with the sheriff as much as I could to see if they had got any lineup onto her." He testified that he did not learn of her whereabouts until "they arrested them down in New Mexico."

Referring to Enolabel's testimony concerning the February conference with Jackson at his home when she and Jackson had told her father they were going to leave, Mr. Allen testified that he remembered no such meeting. He said that the only time he knew of any impending trip was on a prior occasion when Jackson, his wife and children had taken Enolabel on a 5-day trip to Central Oregon.

Asked point blank if he had given his consent, Enolabel's father answered, "No."

Q. Now, during the time that your daughter left on March the 25th, 1966, did you ever hear from her? A. No. Q. Did you ever hear from Mr. Jackson as to her whereabouts? A. No, sir. Q. Mr. Allen, did you give consent to Mr. Jackson to take your daughter on March the 25th, 1966? A. I did not. I didn't even know they was going.

He testified that Jackson and Enolabel never did tell him that she was pregnant; that he did not learn of her pregnancy until her return from New Mexico the latter part of April when Mrs. Jackson told him.

On cross-examination, he chose to regard his daughter's role with the Jacksons as that of baby-sitter because they paid her. He said that he approved of the way they treated her—as one of their own children. He said that he would not object to her going with Mr. Jackson if he knew where they were going and when they would return.

He admitted that he and his wife signed a letter about 5 months after Enolabel's return, written by his son Tom, dated September 23, 1966, to Arthur Eggers, the prosecuting attorney, expressing the hope that the charges against Jackson could be dismissed because the Jacksons did have permission to take Enolabel anywhere anytime.[1]

---

[1]
"Box 211
Waitsburg, Washington
Sept. 23, 1966

"Arthur Eggars
Drumheller Bldg.
Walla Walla, Washington
Dear Mrs. Eggers:

"In regard to the charge of second degree kidnapping on Ron Jackson, Tom wants to inform you that Enolabel did stay with the Jacksons a great deal and that the Jacksons did have our permission to take Enolabel anywhere at any time. Since anywhere does include New Mexico, we must say that Ron Jackson had his permission to take Enolabel to New Mexico.

"Had we received the letter which Ron had instructed Enolabel to write, and which she did write but neglected to mail, there would have been no complaint to the police from any of us. We simply wanted to know where she was.

"Because of these facts, we earnestly hope that you will drop the charges on Ron Jackson as the above will have to be our testimony in court. Thank you.

"Respectfully,
Thomas W. Allen
Novella Allen

"cc: Murray E. Taggart

"P.S. Dad gave his permission 16 to 18 months before the incident occurred. He has just remembered this fact.

"Lee Allen"

He also wrote another letter, about the middle of September, 1966, to Mr. Eggers, requesting that the defendant be turned free, asserting his daughter had threatened suicide if Jackson had not taken her away; that Jackson was "only trying to save her life and keep her from shame;" that Enolabel was the cause of not letting him know about the trip; and that her two brothers knew the name of the father of the child but would not divulge to him the man's identity.

Returning to Enolabel's testimony, she testified that, before Jackson had left Waitsburg approximately two weeks prior to their rendezvous at the gun club, he had told her to write her mother a letter advising that she was with Jackson. She said that she complied, and left the letter for her mother under her mattress. The letter, written and dated March 25th, said:

> Dear Mom: I know you won't understand but I have to leave with Mr. Jackson. Don't worry about me because he will take good care of me. I'll be home sometime this fall. Love, Enolabel.

Enolabel said she forgot to mail the letter; she put it between the two mattresses on her bed in the Jackson home right after she wrote it on March 25, 1966—after she returned from school that day. She said that sometime in the last part of July—about 2 months after her return—she called Murray Taggart, Mr. Jackson's attorney at the time, and told him where it could be found. Her telephone call to Mr. Taggart concerning the letter was the first she had mentioned it to anyone between March 25th and the telephone call to Mr. Taggart at the end of July.

Enolabel's mother, alluding to the night Enolabel had left, testified that Enolabel went to the school program the evening of March 25th; that Mrs. Jackson brought her home to the Allen house; that Enolabel quarreled with her brother Joe, and asked to return to the Jacksons' that night as she was going to baby-sit there the next day anyway. Mrs. Allen says that she called Mrs. Jackson the next afternoon, expecting the girl to return home later that after-

noon. When Mrs. Jackson told her that Enolabel had not been there the night before and was not there at the time, she relayed this to her husband who called the sheriff. She said that Mrs. Jackson informed the law, too. Mrs. Allen did not find out where her daughter was until notified by the sheriff's office on discovery of the two in New Mexico. She said that prior to March 25, 1966, she did not know Enolabel was leaving and that neither Mr. Jackson nor anyone else asked for permission to take her from the Allen home. She testified the Allens were receiving welfare assistance and welcomed the opportunity for Enolabel to stay at the Jacksons'.

Mrs. Allen testified that Enolabel shared a room at the Allen home with her older sister Nancy, age 15; but that she stayed at the Jacksons' 5 days a week. Although the Jacksons bought her clothes and provided room and board, she felt that Enolabel earned these things helping around the house and baby-sitting. She said that Allens agreed that the Jacksons could claim Enolabel as a dependent on their income tax. She believed the Jacksons were a good influence on Enolabel.

Other evidence presented by the state showed that on March 26th both Mrs. Allen, the young girl's mother, and Mrs. Jackson, the defendant's wife had reported to the Waitsburg marshal that Enolabel was missing and that the officer turned this report in to the sheriff of Walla Walla County. The Waitsburg chief of police said that Mrs. Allen thereafter "quite often" made inquiries whether the authorities knew anything of Enolabel's whereabouts. The Waitsburg police learned nothing more until they received a call from Las Vegas, New Mexico, that Enolabel and Jackson had been located there.

The sheriff said he first received the report at 6:15 a.m., March 26th, from Mr. Todt, the Waitsburg marshal; and another missing person report from Tom Allen, Enolabel's father the next day at 11 a.m. Mrs. Jackson, he said, had reported her husband missing by telephone at 7:15 a.m., March 18th. This occurred about a week prior to the meet-

ing at the gun club. He said that, after Mr. Allen first called at his office to report his daughter missing on the 27th of March, Mrs. Allen made further inquiries as to Enolabel's whereabouts, coming in on April 12th, and again making inquiries on April 13, 14 and 15. He recalled some other inquiries made by her of which he had made no written memorandum. April 23rd, he confirmed by telephone call from the sheriff of Las Vegas, New Mexico, that Enolabel was in custody there.

Frank C. Delgado, Sheriff of San Miguel County, New Mexico, testified that his office had received word of a couple in the mountains and after driving his car as far as possible into the hills hiked another 5 miles to find Jackson and Enolabel at the 7,800 foot level. He said that he had learned Jackon's name from papers found in the power wagon. When he first located them, Sheriff Delgado testified they were in a small homemade tent—sleeping, he thought, in a sleeping bag. Jackson, he said, told him that Enolabel was his daughter. On calling Waitsburg, Delgado first learned that the authorities in Washington were searching for the pair.

Did the evidence warrant a verdict of guilty of kidnapping in the second degree? Was there sufficient credible evidence to prove beyond a reasonable doubt each of the following elements: (1) That the defendant willfully took Enolabel Allen away from her parents; (2) that he took her away with intent to conceal her from her parents; (3) that at the time she was under 16 years of age; and (4) that, at the time she was taken away, she was in the lawful custody or control of her parents. Defendant did not take the witness stand.

There seems to be little point in discussing the proof as to the first, third and fourth described elements of the offense. The evidence presents a strong case of the defendant's and Enolabel's long journey together, a continuous absence from their respective homes together, and that Enolabel, being only 13 years of age, was still in the custody and control of her natural parents, despite living in

and working at the Jackson home a majority of the time with her parents' knowledge, consent and approval.

Our inquiry narrows down to an examination of the evidence relating to the second element of second-degree kidnapping to ascertain if the evidence permitted the jury to find affirmatively that, in taking Enolabel with him, the defendant intended to conceal her from her parents.

Arguing strenuously from the Allens' obviously softened attitude toward him, as shown by the letter requesting the prosecuting attorney to dismiss the charges, and from Enolabel's friendly attitude, defendant says that the whole evidence fails to show an intent to conceal Enolabel from her parents. He contends that the prior friendly relationships between the Jacksons and the Allens and the latters' acknowledged acquiescence that Enolabel could accompany the Jacksons—plus the fact that Enolabel lived at the Jackson residence more than half the time—add up to an implied consent, and thus a failure to show intent to conceal Enolabel from her parents.

All of these matters going to the question of parental consent and intent to conceal the girl from her parents were quite properly presented to the jury. But, they were just that—matters of defense, facts to be considered by the jury in determining the issues of parental consent and intent to conceal. The jury, in viewing the arrangement between the two families and the more or less friendly attitude shown by the Allens toward the defendant at trial, in light of all of the other evidence could well conclude that the Allens had neither expressly nor impliedly consented to Jackson's taking their daughter and that in taking her he intended to conceal her from them.

A sizable quantum of evidence, starting with the prearranged clandestine meeting between Enolabel and the defendant during the night of March 25th at the gun club, enabled the jury to find the element of intent to conceal proved. Evidence that Enolabel's parents and the defendant's wife repeatedly requested the police authorities for information of the two missing persons showed want of

parental consent. The lack of direct proof that Enolabel's parents had ever relinquished parental control or authority over Enolabel, much less ceded it to the defendant, when considered along with proof of the secret rendezvous at the gun club the night of March 25th after Enolabel had told her parents that she was returning to the Jackson home, enabled the jury to find that Enolabel had never left the care, control and custody of her natural parents.

Finally, the evidence established that news of the couple's whereabouts first arrived from the Sheriff of San Miguel County, New Mexico, and did not come from the defendant. Other than Enolabel's testimony that at some future date they intended to communicate with Mrs. Jackson and her parents, the record contains no evidence to support such an intention. The continuous, unexplained and unreported absence of the two for 1 month gave the jury ample latitude, when viewed in the light of the whole case, to find the defendant guilty.

Neither the evidence that the Allens, had they known in advance about the trip, probably would have consented, nor the indications that their attitude toward the defendant softened as the trial date approached, would be a determinative defense, regardless of the plea by the Allens to dismiss the charges against the defendant. Evidence that Enolabel had deposited in her mattress a letter addressed to her mother, coming to light long after the events on which the charge had been laid, presented no conclusive defense whatsoever. It remained a matter for the jury to determine the guilt or innocence of the accused in light of all evidence.

■ In spite of the showing that Enolabel's parents tended to forgive the conduct of defendant, and, before trial, took a light view of his actions, the case had been taken from their hands by operation of law. Neither parent possessed legal power to forgive or alter the legal effect of the evidence. The crime, if any, was against the sovereign state, not against the parents. See *State v. Camp,* 67 Wn.2d 363, 407 P.2d 824 (1965), where, after the defendant had

been charged with abduction for taking an underage girl without the consent and against the will of her parents for purpose of marriage, we affirmed the conviction despite the parents' subsequent approval and consent to the marriage.

In reviewing a criminal conviction, we do not say that a court of appeals is completely devoid of power to examine the record and ascertain therefrom if the evidence in sum proves a crime and that the defendant committed it. There must be some small interstice left for the intervention of appellate jurisdiction where, despite a verdict of conviction, the whole record does not prove a crime or defendant guilty. But, notwithstanding this reservation of appellate power, the verdict of the jury remains paramount. Where there is substantial evidence to prove a crime and the defendant's commission of it, the jury is the sole and exclusive judge of the evidence and its verdict is conclusive as to the facts. *State v. Davis,* 53 Wn.2d 387, 333 P.2d 1089 (1959). There was abundant evidence here to support the jury verdict of guilty.

Defendant assigns error to the court's refusal to give his requested instructions Nos. 15 and 16, but our review of the record shows that the court properly instructed the jury and that these assignments are without merit.

Affirmed.

FINLEY, C. J., HILL and ROSELLINI, JJ., and BARNETT, J. Pro Tem., concur.

---

October 10, 1967. Petition for rehearing denied.